**Thomas GRIGGS, Plaintiff,**

v.

**Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 81–1041.**

United States District Court,
S. D. West Virginia,
Bluefield Division.

Aug. 17, 1982.

Robert Browning, Jr., Bailey, Worrell, Viers & Browning, Pineville, W. Va., for plaintiff.

David A. Faber, U. S. Atty., Charleston, W. Va., for defendant.

## MEMORANDUM ORDER

KIDD, District Judge.

This is an action under Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) and § 1383(c)(3), (hereinafter "the Act"), to review a final decision of the Secretary of Health & Human Services (hereinafter "Secretary"), which denied plaintiff's claim for a period of disability, disability insurance benefits, and supplemental security income.

Plaintiff applied for disability insurance benefits on April 17, 1979. He was denied benefits by the State Agency and he requested reconsideration. Upon a second denial, after reconsideration, plaintiff filed a request for a hearing. At the hearing which took place on November 20, 1980, the plaintiff was present with his attorney. A vocational expert was also called upon to testify. The administrative law judge, upon finding that the plaintiff suffered no severe impairment, affirmed denial of benefits. The Appeals Council denied the request for a review, thus making the hearing decision the final decision of the Secretary. Plaintiff filed suit here on May 5, 1981.

The Court's function on review is limited to determining whether there is substantial evidence in the record, considered as a whole, to support the findings of the Secretary. 42 U.S.C. § 405(g). For the reasons set forth herein, the Court is of the opinion that there is not substantial evidence to support the decision of the Secretary and that this case must be remanded.

Plaintiff was born on July 7, 1951 and has a sixth grade education. Plaintiff claims that he became disabled in February of 1978 as a consequence of the combined effects of back problems, lungs, stomach, heart and nerves.

Disability is defined in the Social Security Act as:

"(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months or (B) blindness."

42 U.S.C.A. §§ 416(i)(1), 423(d)(1).

When making a finding as to plaintiff's ability or inability to engage in any substantial gainful activity, there are four elements of proof to be considered. They are: (1) medical data and findings, (2) expert medical opinions, (3) subjective complaints, and (4) plaintiff's age, educational background, and work history. *Underwood v. Ribicoff*, 298 F.2d 850 (4th Cir. 1962). However, under the regulations, if a claimant has an impairment or impairments which meet or equal those listed in Appendix 1 to Sub-part P of the Social Security Regulations, a finding of disability shall be made without consideration of the vocational factors. 20 C.F.R. § 404.1503(d). The plaintiff has the burden of proving that he is disabled. *Blalock v. Richardson*, 483 F.2d 773 (4th Cir. 1972).

It is not the mere presence of an impairment or impairments that determines disability but rather the effect the impairment or impairments have upon the individual in his ability to perform substantial gainful activity. *Thomas v. Celebrezze*, 331 F.2d 541 (4th Cir. 1969). In evaluating effects of various impairments upon a disability benefit claimant, the Secretary may not fragmentize them, but must treat them in combination. *Hicks v. Gardner*, 393 F.2d 299 (4th Cir. 1968). Disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity. *Bass v. Celebrezze*, 238 F.Supp. 355 (D.C.S.C.1969).

## TESTIMONY

As previously stated, only the plaintiff and a vocational expert testified at the administrative hearing.

The plaintiff's testimony reveals that when he was 16 years of age, and in the sixth grade, he quit school and moved to Illinois to live and work at odd jobs with his step-father. After a time, he returned to

West Virginia and became employed as a service station attendant. He engaged in service station work between 1972 until the time of the onset of his alleged disability.

The plaintiff stated that he has had no special training but did say that he possesses a "preacher's license" and preached for about one and one-half years, both before a congregation and on the radio. He said that it was too expensive to continue radio preaching and he became too nervous to preach before a congregation.

The first time the plaintiff began experiencing medical problems was in 1976 when he started having difficulty with his stomach. Thereafter, he developed a problem with his nerves and began having breathing difficulties.

With regard to nervousness, the plaintiff testified that, "the depression that I get and the nervousness that I get I do—sometimes it does cause me to cry." *Tr.* at 38. He also said that he has thought of suicide since his father's death, and other documents and recitals in the record indicate that the plaintiff's mental problems began after the plaintiff's father was killed in a trailer fire. The most revealing testimony regarding his nerves is as follows:

> ". . . I get nervous and shakey if I'm around where there's a lot of noise and sometimes I get tense with my family and at times I can't hardly get along with them. I just, you know, get mad and grouchy over things I shouldn't, you know, it shouldn't happen. And my nerve pills I take them and it helps calm me down most of the times, you know, that I do get nervous—real nervous, I usually get off by myself somewhere where it is peace and quiet and it seems like the nerve pills, you know, does help calm me down. It takes care of—helps take care of the problems that I've got." *Tr.* at 36–37.

The "nerve pills" that he alludes to include Valium.

The plaintiff also testified that a brother has mental problems which cause periodic hospitalization. The Court also notes that a clinical psychologist determined, from interview, that four of the plaintiff's eight siblings are disabled, as is his step-father. *Exhibit* 25.

When questioned by his counsel about whether he had breathing problems, the plaintiff stated:

> "Yes, sir, sometimes if—it depends on, you know, what I do. If—if I walk a certain extent, I do breathe hard. If I get to doing something, you know, messing around with something, it will take me awhile to do it and if there is any kind of lifting in it, I will get short of breath. It depends on what I do." *Tr.* at 40.

The extent of his ability to exert himself was not developed but he did say that a neighbor mows his grass and all he does is paint small items from time to time, watch some television or listen to the radio, visit his neighbors and his mother and attend church. In answer to questions on his March 1979 "Disability Report" the plaintiff indicated that he could "do most odd jobs" around the house. *Tr.* at 99.

Finally, the plaintiff said that he has "terrible headaches", but there is no objective medical evidence of this condition nor any evidence of the effects of headaches upon the ability to work.

The testimony and medical reports also disclose that the plaintiff has had problems with cysts on his hip, but surgery has alleviated this condition and it does not appear to affect his physical abilities. The cyst surgery appears to be one of two times that the plaintiff has been hospitalized for anything.

At the time of the administrative hearing the plaintiff was taking Mylanta, Emprin # 3, Paratrate, Glycerin (Nyg 1/150 gr.) and Valium for his various ailments.

## MEDICAL EVIDENCE

### Nervous Condition

The first medical report contained in the record in this case is a June 11, 1974 report of a Dr. Borbely, whose qualifications are not apparent from the record. The Borbely report is among the records of the Wyo-

ming General Hospital which were submitted to the State Disability Determination Section of the West Virginia State Agency. *Exhibit* 29. Dr. Borbely recommended a psychological and psychiatric evaluation to determine vocational potential concluding that the plaintiff suffered from a "high level of anxiety" and a low intelligence capacity.

The next report which is solely dedicated to the plaintiff's mental condition is a psychological evaluation offered by Mari W. Stone, a clinical psychologist. The Stone report indicates that during the interview and testing the plaintiff tried hard and was cooperative and he worked slow and deliberately. Stone was of the opinion that the plaintiff had little self-confidence and possessed little initiative, had a fair memory but poor insight, was not delusional but was obsessed with his health and finances. After this consultation and upon administering the WAIS and Bender tests, this psychologist diagnosed a "moderately high level of depression" and Borderline Mental Retardation as suggested by the plaintiff's tested full-scale I.Q. of 71.

Psychologist Dreama Baker of the Raleigh Psychiatric Services, Inc., examined and tested the plaintiff on November 2, 1978, and her December 13, 1978 report contains a diagnosis which is consistent with that of psychologist Stone. Baker recommended "supportive psychotherapy" as a mechanism for helping improve the plaintiff's depressive state. *Exhibit* 27.

Dr. M. Khalid Hasan, a psychiatrist who is also with Raleigh Psychiatric Services, Inc., who neither ordered, conducted nor evaluated any tests but apparently only interviewed the plaintiff, noted the plaintiff's depression, offered a "guarded" prognosis and suggested that the plaintiff "should be seen for treatment" and later re-evaluated for "possible referral to the Division of Vocational Rehabilitation."

The final report concerning the plaintiff's mental condition is a November 27, 1979 report of Dr. Chi Hsien Miao, a psychiatrist. Dr. Miao evaluated the plaintiff's prior psychological and psychiatric history from in-terview and prior reports, noted his subjective physical complaints and medications he was taking and concluded:

" . . . Mr. Griggs does not reveal any apparent evidence of thought or mood disorders. It is felt that Mr. Griggs is suffering from Depressive Neurosis. Prognosis is guarded. He is competent to handle his own financial affairs. He is not considered to be gainfully employed at the present. Supportive therapy, individual psychotherapy, and possible chemotherapy would be beneficial to Mr. Griggs." *Tr.* at 203.

Other of the physicians who treated or examined the plaintiff noted generally his abnormal mental condition.

### Stomach Ailment

On August 16, 1976, Dr. F. J. Zsoldos, a surgeon at the Wyoming General Hospital, examined the plaintiff who was complaining of stomach pain. This doctor diagnosed gastritis and placed the plaintiff on a bland ulcer diet and he was given Mylanta. Dr. Zsoldos caused studies to be conducted and the results of the studies suggested "no evidence of . . . any organic lesion of the upper gastrointestinal tract." However, Dr. Zsoldos still suspected that the plaintiff might have an ulcer so he put the plaintiff on an "acute ulcer diet and prescribed Probanthine, Librium and . . . Mylanta."

After a return visit on December 6, 1976, Dr. Zsoldos wrote:

"Pt. still smoking—advised to quit smoking. Need psychiatric consultation Dr. Borbely. I can't see why he isn't working." *Tr.* at 132.

R. O. Gale, a radiologist, examined the plaintiff and caused x-rays and a barium test to be conducted to determine the existence of an ulcer. In his March 22, 1978 report he concluded that there was "no evidence of an organic lesion of the upper gastrointestinal tract."

In August 1978, Ross E. Newman, a specialist in obstetrics and gynecology, saw the plaintiff and diagnosed "gastritis, malnutrition, emaciation, anxiety state." Based

upon a general physical examination, laboratory tests (including an upper GI series that was normal), and reported history, Dr. Newman made the above diagnosis and placed the plaintiff on medication and after four days in the hospital with "more or less supportive therapy", discharged the plaintiff for later follow-up. Newman's August report stated that fluoroscopic study of the stomach revealed no evidence of an ulcer. He also reported that "there has been very little shortness of breath."

Perhaps the most complete report in the record in this case, if not also the most revealing, is that of Kenneth Byers, a specialist in internal medicine. Dr. Byers' report resulted from gathering a personal and medical history, giving a physical examination, listening to the plaintiff's voiced complaints and causing several tests and studies to be run.

A stress test proved negative for heart disease. Dr. Byers opined that the plaintiff's chest pains were angina. Pulmonary function studies demonstrated no significant pulmonary insufficiency. However, a chest x-ray was reported as follows:

"Chest x-ray reveals the soft tissues and bony thorax to be normal. The lung fields show scattered fibrotic changes and mild hyperlucency and low diaphragms compatible with chronic obstructive pulmonary disease. The heart is normal in size. The left ventricle does not encroach on the thoracic spine on lateral chest x-ray. The CT ratio is 9.34." *Tr.* at 186.

Interview of the plaintiff by Dr. Byers led to the doctor's impression that the plaintiff was depressed.

Doctor Byers, like the other doctors and psychologists, offered no opinion as to what, if any, effect the plaintiff's medical and mental condition had upon his ability to perform work.

The only other significant medical report in the file is a November 1980 letter from Dr. Ross Newman to Social Security, which was written at the urging of plaintiff's counsel. This letter is significant only because Dr. Newman did treat the plaintiff in 1978. In this writing Dr. Newman, upon reviewing his records, continues to speculate that "an ulcer might be present", notes medications prescribed, summarizes the plaintiff's work history, says the plaintiff is "much *overweight*" (which is surely a misstatement), then incredibly finds that the plaintiff "... appears to be unable to perform any gainful work." *Tr.* at 219. How this doctor went from suspecting an ulcer to total disability is a complete mystery.

### Other Ailments

The plaintiff also alleges that he has a bad back, severe headaches, heart disease, and underwent cyst surgery. There is either absolutely no objective medical evidence of these conditions or so little information as to make them insignificant for serious consideration. Cyst surgery was mentioned but any adverse affect of this procedure is not reported and it is thus assumed that the plaintiff suffers no effects from that surgery. The nature, extent and effect of headaches is barely mentioned.

### VOCATIONAL EXPERT

The vocational expert who testified in this action classified the plaintiff's past relevant work experience as light to possibly medium in effort required, and unskilled.

The administrative law judge proposed the following hypothetical:

"If we assume for the purposes of this question that the claimant has the residual functional capacity for light levels of work, if we assume that the definition of light work implies the capacity to stand and walk six hours in an eight hour work day and lift a maximum of 20 pounds, then considering his age and education, if he had the capacity for light work, the social security rules in the social security regulations would direct a finding that he is not disabled.

"However, if we further consider his mental impairments and if we consider for the purposes of this question, the statements that are made in the report of Dr. Mehow, in Exhibit 31, which the ex-

amination was performed in November of 1979, it would indicate that he has about borderline intelligence, that he has a moderately high level of depression with little self-confidence, with few internal resources and that the content of his thought is superficial, that his abstraction ability was concrete, that he can perform simple calculation, he has a lack of insight with fair judgment and no thought or mood disorders.

"If we consider those impairments as listed in that report, would you state whether there would be light or sedentary jobs that he could perform with those impairments as I have just stated?"

The expert's answer:

"Well, the things that you've specifically referred to would not preclude simple routine work requiring no judgment or computation or conceptualizing ability. Whether or not he could actually performing (sic) anything from a psychiatric point of view, I really don't know. I don't believe the thing that you have just mentioned would prevent doing routine repetitive tasks requiring no judgment or computation.

"Now, jobs that would be of this nature would be in the light category. Now, you're assuming that he can perform at the light level of exertion, would be jobs like bus boy, car lot porter, food service worker, building custodian, fire clerk or watchman as many settings require them moving around in the interior of a closed building during off hours, garment inspector. Those would be some examples of jobs that would not require any significant judgment of computations to be made.

"Here again, this is not to say that he could actually perform those jobs, I'm just saying with the—with the traits and the conditions as you're specifying having to do with his ability to conceptualize and do computations and those—those wouldn't appear to interfere with routine work." *Tr.* at 52–53.

Inquiry of the vocational expert by the administrative law judge could certainly not be characterized as "probing" and plaintiff's counsel wanted to know nothing of this expert.

The questioning of the vocational expert was totally inadequate and led to few revelations. Most importantly, the hypothetical included an assumption of capacity to do light work and a depressed plaintiff with marginal intelligence and no more. Based upon these assumptions it does not take an expert to offer an answer; if a job exists, the administrative law judge has hypothesized that the plaintiff can perform it.

## DISCUSSION

It is ridiculous to believe that any court or judge could form a sound opinion or reasoned judgment based upon this record.

In an attempt to evaluate the plaintiff's documented ailments the Court has analyzed *Appendix* 1 to Subpart P of the Social Security Regulations, 20 C.F.R., for guidance. The plaintiff has introduced ample evidence of depressive neurosis. § 12.00 B 3 of *Appendix* 1 provides:

"Functional nonpsychotic disorders are likewise characterized by demonstrable mental abnormalities without demonstrable structural changes in brain tissue (psychophysiologic, neurotic, personality and certain other nonpsychotic disorders)."

Likewise, § 12.00 B 3.b states:

"Neurotic disorders (e.g., anxiety, depressive, hysterical, obsessive-compulsive, and phobic neuroses). In these conditions there are no gross falsifications of reality such as observed in the psychoses in the form of hallucinations or delusions. Neuroses are characterized by reactions to deep-seated conflicts and are classified by the defense mechanisms the individual employs to stave off the threat of emotional decompensation (e.g., anxiety, depression, conversion, obsessive-compulsive, or phobic mechanisms). Anxiety or depression occurring in connection with overwhelming external situations (i.e., situational reactions) are self-limited and the symptoms usually recede when the situational stress diminishes."

§ 12.00 A sets forth exactly what factors should be considered when determining whether a person is disabled as a consequence of a mental disorder. This provision also suggests how severity and duration of the mental impairment can be established.

The current record contains a well documented neurotic disorder, some testimonial evidence regarding plaintiff's normal routine, but almost no evidence of severity and duration of the mental condition. Other than the plaintiff saying that he becomes nervous around people, there is almost no reliable information or opinions concerning how the plaintiff's depression affects his ability to perform jobs to which he is suited when considering his age, education and experience. The current record would certainly support a finding that this individual could not now pursue his preaching ambitions due to his anxiety when confronting people and noise. His condition may also dictate that he cannot at this time be a service station attendant for the same reasons. However, would his anxiety or depression prevent him from being a night watchman, or custodian or stock clerk or any other of the numerous jobs which do not require significant contact with other people? The administrative law judge found that the plaintiff could do these jobs, but this finding could not have been based upon psychological or psychiatric reports because such reports did not suggest the severity of the plaintiff's mental condition.

The psychiatrists and psychologists who examined and tested Griggs did offer descriptions such as "moderately high level of depression" and "high level of anxiety" or just "depressive neurosis." In this context, without more, the Court has no idea whether "moderate depression" or "high anxiety" is debilitating, and if it is, how debilitating. Key words such as "mild", "moderate", "high" or "severe" are only of some limited value. "Moderate depression" is a diagnosis with meanings which vary from professional to professional and from one individual to another. The Court wants to know what "moderate depression" means in a social security setting (*i.e.*, how it affects this particular individual's ability to work considering the relevant variables). Social Security has forms which lend meaning to such descriptions, whether the description is offered by a medical or mental health professional.

Likewise, if his depression is not so severe as to prevent jobs like custodian, stock clerk or watchman, would the depression, when combined with a 71 or 73 I.Q., and stomach problems and breathing difficulties prevent such work?

What is the extent of the breathing impairment? The evidence in this regard is very sketchy and what little evidence there is, is of little help. Thus, is there a medically determinable lung impairment and if so, how, and to what extent, does it affect the ability to perform work-related functions? Is shortness of breath a symptom of the nerves and anxiety?

There is no objective medical evidence of a stomach lesion so is the stomach problem directly related to the diagnosed neurosis? *I.e.*, are the stomach ailment and weight loss other symptoms of the neurosis thus being descriptive of the severity of the neurosis?[1]

Does the plaintiff experience the same symptoms (*e.g.*, nausea, nervousness) when he is not working as when he is working?

Has he taken advantage of counselling and therapy as recommended by virtually every professional who has examined or treated him? Would continued counselling

1. 20 C.F.R. Appendix 1, § 513 provides:
   "Malnutrition or weight loss from gastrointestinal disorders. When the primary disorder of the digestive tract has been established (e.g., enterocolitis, chronic pancreatitis, post-gastrointestinal resection, or esophageal stricture, stenosis, or obstruction), the resultant interference with nutrition will be considered under the criteria in 5.08. This will apply whether the weight loss is due to primary or secondary disorders, of malabsorption, malassimilation, or obstruction. However, weight loss not due to diseases of the digestive tract, but associated with psychiatric or primary endocrine or other disorders, should be evaluated under the appropriate criteria of the underlying disorder."

or therapy render the plaintiff capable of continued employment? *See* 20 C.F.R. § 404.1530.

Very importantly, does the medication which the plaintiff takes control his anxiety and depression to the extent that he can work? Would the medication have adverse affects upon the plaintiff's ability to work?

There are numerous other vital unanswered questions. The Court has analyzed this record very carefully and still knows very little about the ability of Thomas Griggs to engage in substantial gainful employment.

20 C.F.R. § 404.1513(d) provides:

"The medical evidence, including the clinical and laboratory findings, must be complete and detailed enough to allow us to make a determination about whether you are disabled or blind. It must allows us to determine—

"(1) The nature and limiting effects of your impairment(s) for any period in question;

"(2) The probable duration of your impairment; and

"(3) Your residual functional capacity to do work-related physical and mental activities."

The problem in this case, as in all too many cases which reach this Court, is that the reports are *NOT* "complete and detailed enough" to allow any reasonable determination to be made.

Of course, the burden is initially upon the claimant, *and not this Court or the Secretary* to produce sufficient evidence to establish disability. *E.g., Brown v. Celebrezze*, 367 F.2d 455 (4th Cir. 1966); *Currier v. Secretary of H. E. W.*, 612 F.2d 594 (1st Cir. 1980). The law is that once the claimant has proven the inability to return to his regular work, the burden shifts to the Secretary who must show that there is other gainful employment for which the claimant is suited. *Warner v. Califano*, 623 F.2d 531 (8th Cir. 1980). And, this Court follows the rule that although the claimant has the burden of proving his disability, the administrative law judge is required to develop the facts fully and fairly even if the claim-

ant has counsel. *Thorne v. Califano*, 607 F.2d 218 (9th Cir. 1979). This stands to reason since the Act is remedial in nature and to be liberally construed. *Haberman v. Finch*, 418 F.2d 664 (2nd Cir. 1969).

█ Here, the administrative law judge found that the plaintiff had not proved that he suffered a severe impairment. A non-severe impairment is defined under 20 C.F.R. § 404.1521 as one which "... does not significantly limit ... physical or mental abilities to do basic work activities." And this section further defines "basic work activities" as follows:

"(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—

"(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling;

"(2) Capacities for seeing, hearing, and speaking;

"(3) Understanding, carrying out, and re-membering simple instructions;

"(4) Use of judgment;

"(5) Responding appropriately to supervision, co-workers and usual work situations; and

"(6) Dealing with changes in a routine work setting."

The record simply does not include enough detail to determine whether the plaintiff does, or does not, possess the skills and abilities suggested. The record does indicate a deficiency in judgment and *possibly* some physical limitations but little more.

The lack of facts going to abilities and inabilities leaves only speculation and conjecture as a basis for any opinion in this case.

As previously alluded to, the one factor which makes this case the most impossible for final resolution is the lack of medical evidence suggesting what effect the plaintiff's proven impairments (stomach, nerves) have upon his functional capacity for employment. Normally in a social security case, at least a couple of doctors risk what-

ever it is they think they risk, and offer an opinion as to how limiting the diagnosed condition might be. In this case no professional took this great and weighty leap—except Newman who had no apparent basis for his bottom-line opinion. Often when opinions are offered in the social security case the opinion is "no disability" or "total disability" which is based upon little or no objective medical evidence. *See* 20 C.F.R. § 404.1527. This Court gives such an opinion about the same amount of weight as it would give to the opinion of a lay-bystander —none.[2]

For the medical opinion to be worthy of serious consideration it should be based upon that professional's considered judgment which is formed after analysis of available reports, tests and at least an examination and interview of his patient. This is not to say each professional must require exhaustive tests and perform every examination. If the claimant sees Dr. Smith for back problems, before Dr. Smith's opinion on the back condition is given weight, it should be apparent that he spoke with the claimant, gave standard tests and examinations, considered at least the plaintiff's voiced medical history and vocational history. With this background, Dr. Smith can say "based upon my examination, tests, interview, and the medical and vocational history of this patient I find that he is capable/incapable of _____." However, what this Court generally sees is either the bottom-line opinion alluded to above, or a report which includes a diagnosis of "degenerative disc disease" and no more. What use can the administrative law judge or this Court possibly make of such naked and conclusory remarks? Courts can, do, and must make difficult decisions in every case; however, normally in a law suit the record is developed to a point that the difficult decision can be made with some degree of confidence. This case, as so many

of these cases, consists of one judge after another pouring over voluminous, albeit incomplete or unrevealing, documents and offering their "gut" feelings as to whether a claimant is incapable of work.

The Act and regulations, if followed, are complete, understandable and lead to just, consistent and reliable results. However, professionals, particularly the medical profession, give life and meaning to the regulations. This life and meaning is provided by medical findings which include reports and evaluation of "symptoms, signs and laboratory findings", 20 C.F.R. § 404.1528, and hopefully more, as previously discussed.

Again, speculation is foreign to the practice and experience of the legal profession and cannot be used as a basis for judging matters as important as the Social Security disability claim. Speculation does not lead to just and consistent results but only to intellectual chaos and unfairness.

Upon remand the Secretary shall cause the record to be developed consistent with this opinion and particularly as follows:

(1) Factually, with regard to what this claimant can, and cannot do, both from the testimony of the claimant and from the considered judgment of treating and examining professionals.

(2) Medically, by submitting proper forms[3] or instructions to any physician, psychiatrist, psychologist or other professional who examines the plaintiff. In this regard, the Secretary shall:

(a) Cause the plaintiff to be examined or re-examined by one or more mental health professionals who should provide information concerning the nature, extent, duration and effects of the plaintiff's neurosis. Information regarding medications and their effects upon the plaintiff's motor and mental skills. And, information regarding the likelihood or probability of medication and counselling or therapy "curing" the

---

2. Dr. Newman would be considered a treating physician in this case and this Court certainly does give great weight to the every word of a treating physician. However, the final word of the treating physician must be based upon more than compassion, hostility or philoso-

phy—the final word must be based upon medicine.

3. For example, HA–528(10–79), or HA–667(3–79).

plaintiff or lessening the effects of his mental disability upon his ability to work and interact with people (his prognosis).

(b) The same types of information as in (a) above but from doctors who examine or re-examine for alleged problems with the stomach and lungs.

(3) By submitting complete, and possibly alternate hypotheticals to the vocational expert.

(4) If the plaintiff sustains his burden of proving a severe impairment, by determining residual functional capacity according to law.

(5) By requiring the testimony of a medical advisor if such advisor could shed light upon medical or psychiatric terminology or if he could explain the significance of medical or psychiatric data.

Accordingly, it is ORDERED that this case be, and the same is, hereby remanded to the Secretary of Health and Human Services for further action, and while the case is on remand it is to be retired to the Court's inactive docket.